UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Alan F. Bernard,

      Plaintiff,

      v.                               Civil Action No. 2:14-cv-148-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

**<u>OPINION AND ORDER</u>**
(Docs. 12, 13)

Plaintiff Alan Bernard brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Bernard's motion to reverse the Commissioner's decision (Doc. 12), and the Commissioner's motion to affirm the same (Doc. 13). For the reasons stated below, Bernard's motion is DENIED and the Commissioner's motion is GRANTED.

**<u>Background</u>**

Bernard was 33 years old on his alleged disability onset date of March 20, 2008. He completed school through the tenth grade, attending some special education classes. He has job experience as a short-order cook, a baker, a painter, a floor-stripper, an auto service attendant, an auto service manager, and a construction worker. He worked for

approximately six months during the alleged disability period as a fry cook at Kentucky Fried Chicken and Taco Bell, but not at the level of substantial gainful activity.  He also tried to help friends doing construction work during the alleged disability period, but these attempts failed largely because he was unreliable due to arm pain.

At the November 2012 administrative hearing, Bernard testified that he is separated from his wife and has three children, ages 15, 17, and 20.  (AR 39, 60–61.)  As of the date of the hearing, he was living with his youngest two children; his brother-in-law was staying with them three days a week; and his granddaughter dropped by almost every day.[1] (AR 60.)  He relied on his daughter and brother-in-law to cook, clean, and shop for food. (*Id.*)  Bernard's appearance is apparently notable, an examining consultant stating as follows in February 2008: "Bernard presents with a striking appearance due to a combination of dental problems, numerous tattoos, and one eye being markedly askew."  (AR 466.)  The consultant explained that Bernard was missing teeth, had numerous tattoos on both arms, and wore a t-shirt even though it was winter.  (AR 465.)  The consultant also noted that Bernard "appears able to relate to people well except for his appearance which might offend many."  (AR 466.)

Bernard suffers from multiple pain issues, including primarily pain in his left arm and elbow and tingling and numbness in his left hand.  In September 2003, he was assessed with cubital tunnel syndrome and surgery was performed on his left elbow.  (AR 391–92.) Despite the surgery, as of August 2005, Bernard continued to complain of left elbow pain,

----

[1] In a December 2010 Function Report, Bernard stated that he was living in an apartment with his wife and three children.  (AR 321.)  And in a May 2011 Function Report, he stated that he was living in an apartment with his three children and one granddaughter.  (AR 358.)

claiming it made sleeping difficult. (AR 401.) He was assessed with ulnar neuritis, which is inflammation of the ulnar nerve in the arm, resulting in hand numbness or weakness. (*Id.*) At the November 2012 administrative hearing, Bernard stated that his left arm/elbow pain was "like a toothache, . . . where the pain just doesn't go away, nothing helps it, it's very excruciating." (AR 43.) He stated that some days, this pain is not as severe and he is able to do four to six hours of work, but on other days the pain flares and he has no use of his left hand and severe pain from his left armpit to his left elbow. (AR 66.) Bernard also suffers from carpal tunnel syndrome, neck pain, lower back pain, shoulder pain, and sciatica.

Bernard testified that, on a typical day, he wakes at around 4 or 5 a.m., showers to relieve his neck/back pain, reads, draws for about 45–60 minutes at a time, naps twice per day for 30–40 minutes at a time, and does as much housework as he can which typically includes doing laundry, dusting, and cleaning off the counters. (AR 58–59, 61–63, 65.) He stated that he has tried physical therapy, medications, and injections to alleviate his arm pain, but nothing has helped. (AR 47, 64.) He has used marijuana to help him sleep, and was prescribed heavy narcotics, which he stopped because they left him unable to function and lacking in motivation. (AR 54.) On the date of the November 2012 administrative hearing, Bernard testified that he was not on any medications other than an anti-inflammatory. (AR 57.)

In December 2010, Bernard filed applications for DIB and SSI, alleging disability starting on December 4, 2004 due to a "broken back," "slipped discs in [the] neck," left elbow nerve damage causing elbow and arm pain, bilateral carpal tunnel syndrome, a torn left shoulder rotator cuff, arthritis with swollen joints, and depression/anxiety.

(AR 146–47, 261–62, 334.)  He later amended his alleged disability onset date to March 20, 2008.  (AR 34–35, 306.)  Bernard's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on November 8, 2012 by Administrative Law Judge (ALJ) Dory Sutker. (AR 31–76.)  Bernard appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified.  On February 21, 2013, the ALJ issued a decision finding that Bernard was not disabled under the Social Security Act from his amended alleged disability onset date of March 20, 2008 through the date of the decision.  (AR 8–19.) Thereafter, the Appeals Council denied Bernard's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–3.)  Having exhausted his administrative remedies, Bernard filed the Complaint in this action on July 28, 2014. (Doc. 5.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her

impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Sutker first determined that Bernard had not engaged in substantial gainful activity since his amended alleged disability onset date of March 20, 2008.  (AR 11.)  At step two, the ALJ found that Bernard had the following severe impairments: "degenerative changes of the cervical and lumbar spine, status post cubital tunnel repair, and labral tear and bankart lesion of the shoulder."  (*Id.*)  Conversely, the ALJ found that Bernard's complex regional pain syndrome (CRPS) was not medically determinable and that Bernard did not have a severe mental health impairment.  (*Id.*)  At

step three, the ALJ found that none of Bernard's impairments, alone or in combination, met

or medically equaled a listed impairment.  (AR 13.)

Next, the ALJ determined that Bernard had the RFC to perform "light work," as

defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except as follows:

> [Bernard] can occasionally push and pull within the weight limitations
> described.  [He] should avoid climbing ladders, ropes, and scaffolds.  He is
> limited to occasional reaching in all direction[s] with the left non-dominant
> upper extremity.  He is limited to rare grasping with the left upper extremity,
> which is defined as less than or equal to 6 percent of the workday.  [Bernard]
> can occasionally finger with the left upper extremity.  He must avoid
> concentrated exposure to vibrations and hazards such as unprotected heights
> and dangerous moving machinery.  He is limited to uncomplicated tasks,
> which are those that can be learned in 30 days or less.  [He] can maintain
> concentration, persistence, and pace for two-hour blocks of time with normal
> breaks.  He is limited to brief and superficial interaction with the general public
> and routine interaction with coworkers and supervisors.  He can occasionally
> reach overhead with the right upper extremity.

(AR 13.)  Given this RFC, the ALJ found that Bernard was unable to perform his past

relevant work as a short-order cook, a painter, a floor-stripper, an auto service attendant, a

construction worker, a baker, and an auto service manager.  (AR 16–17.)  Finally, based on

testimony from the VE, the ALJ determined that Bernard could perform other jobs existing

in significant numbers in the national economy, including the jobs of cashier, ticket-seller,

usher, call-out operator, and surveillance-system monitor.  (AR 18.)  The ALJ concluded

that Bernard had not been under a disability from the amended alleged disability onset date

of March 20, 2008 through the date of the decision.  (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

**I.      The ALJ's credibility assessment is supported by substantial evidence.**

The ALJ found that "[Bernard's] statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms are not entirely credible."  (AR 15.)  Bernard argues that this assessment of his credibility is not supported by substantial evidence because: (a) the ALJ misconstrued the evidence of non-narcotic treatment; (b) the ALJ misconstrued the objective imaging evidence; and (c) the ALJ placed too much weight on Bernard's ability to work prior to his alleged disability onset date.  In response, the Commissioner asserts that the ALJ's credibility assessment is supported by substantial evidence, and a totality of the evidence does not support Bernard's subjective symptomatology to the disabling extent alleged.  The Court agrees with the Commissioner for the following reasons.

**A.      Legal Standard**

As the ALJ acknowledged in her decision (*see* AR 13–14), the regulations prescribe a specific process that an ALJ must follow in assessing a claimant's credibility.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such an impairment, the ALJ evaluates the intensity and persistence of its symptoms to determine how they limit the claimant's functioning. 20 C.F.R. §§ 404.1529(c), 416.929(c).  A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316

(N.D.N.Y. 1998); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations of the impairment, then the ALJ must consider additional factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken by the claimant to relieve the symptoms; (5) other treatment received; and (6) any other measures taken to relieve the symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)–(vi), 416.929(c)(3)(i)–(vi).  After considering the claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone v. Apfel*, 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  But a "finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988).  Social Security Ruling 96-7p provides: "When evaluating the credibility of an individual's statements, the [ALJ] must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Here, in assessing Bernard's credibility, the ALJ considered the entire record, applied the relevant regulatory factors, and explained her decision with sufficient specificity to allow meaningful review.  (*See* AR 14–16.)  Moreover, the ALJ's credibility assessment is supported by substantial evidence, and the particular arguments raised by Bernard on this issue lack merit, as discussed below.

**B.     Evidence of Non-Narcotic Treatment**

Bernard first contends that the ALJ mischaracterized and placed too much weight on

the fact that Bernard did not use narcotic pain medications during the alleged disability

period.  The ALJ made the following statements in her decision regarding Bernard's

narcotic use: (1) "[Bernard] testified that he no longer uses any narcotic pain medication.

[The] lack of pain behavior coupled with the lack of need for narcotic pain medication is

evidence that [Bernard's] pain is not as severe or limiting as [he] alleged at the hearing"

(AR 15); and (2) "[Dr. King's] opinion is also inconsistent with [Bernard's] lack of current

need for narcotic pain medication" (AR 16).

It was legally proper for the ALJ to consider, in assessing Bernard's credibility, that

he did not take narcotic medications for pain relief during the relevant period.  *See*

20 C.F.R. § 404.1529(c)(3)(iv); *Smith v. Colvin*, 756 F.3d 621, 626 (8th Cir. 2014) (no error

in ALJ finding claimant not credible based on multiple factors, including that claimant did

not take narcotic medications for pain relief).  Moreover, the ALJ's statement that Bernard

did not take narcotic medication is supported by the record.  Bernard himself testified at the

administrative hearing that he stopped taking narcotic pain medication in December 2010

because it left him unable to function and negatively affected his family life.  (AR 54–55.)

Bernard further testified that, sometime after December 2010, he began taking narcotic pain

medication again, but since that time he has been on a non-narcotic regimen prescribed by

his primary care physician, Dr. Gregory King.  (AR 55–56.)  Bernard stated: "I refuse to

take [narcotics] because . . . they're no good for me.  They make my pain worse."  (AR 56.)

He explained that narcotic pain medication negatively affects his memory and ambition,

leaving him with "no desire to really do anything." (*Id.*)  The ALJ accurately described this testimony, stating:

> When asked why he stopped his narcotic pain medication during the [relevant] period, [Bernard] stated that he was completely unable to function and that his family life was declining. . . .  He stated that he is currently not on any medications due to the side effects. . . .  He explained that the medications haven't been working so great, and that he is planning to trial different drugs until he finds one that works.

(AR 14.)  Thus, the ALJ properly considered Bernard's testimony regarding his decision not to take narcotic pain medication.

Moreover, despite Bernard's claim to the contrary (*see* Doc. 12–1 at 9), the ALJ recognized that Bernard tried other types of medication and methods of treatment–including surgery, physical therapy, marijuana, anti-inflammatory medication, and ice/heat–to relieve his pain (AR 14).[2]  The ALJ also correctly observed that Bernard failed to exhibit pain behavior at medical appointments.  (AR 15.)  Accurately describing the record, the ALJ stated: "[D]espite alleging high levels of pain at his medical exams, [Bernard] was often noted to exhibit very minimal pain behavior." (*Id.*)  The ALJ referred to a February 2012 treatment note prepared by Dr. Robert Giering which stated that, although Bernard rated his pain at a seven out of ten, "[p]hysical evidence of pain during [the] . . . physical exam is mild." (AR 704.)  The ALJ also referred to a January 2013 medical report prepared by

---

[2]  As pointed out by Bernard, the ALJ failed to specifically mention that Bernard also underwent numerous injections for his pain.  (*See* Doc. 12–1 at 9.)  The Court finds no error, however, as "[a]n ALJ does not have to state on the record every reason justifying a decision" and "is not required to discuss every piece of evidence submitted." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted).  Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (internal quotation marks omitted).

consultative examiner Dr. Andres Roomet which described Bernard as "a healthy[-]appearing individual with no obvious pain behavior," despite complaints of severe pain. (AR 835.)

The ALJ considered not only Bernard's absence of pain behavior and failure to use narcotic pain medication in assessing Bernard's credibility, but also Bernard's activities of daily living, stating:

> [Bernard's] reported activities of daily living also support an ability to perform a range of light exertion work.  During the [relevant] period, [he] reported an ability to exercise daily, help his children with their fundraisers and field trips, care for a pet, drive a car, and play pool once per week.

(AR 15.)  It was proper for the ALJ to consider Bernard's daily activities as part of her credibility analysis, *see* 20 C.F.R. § 404.1529(c)(3)(i), and the record corroborates the ALJ's findings (*see, e.g.*, AR 322, 324–25, 359, 464).

### C.    Objective Imaging Evidence

Next, Bernard contends the ALJ mischaracterized diagnostic imaging of his back. But in fact, the ALJ accurately referred to imaging studies from the relevant period which showed only mild findings.  (AR 15.)  For example, a March 2009 MRI of Bernard's cervical spine revealed only a "mild disc bulge with mild osteophyte ridging vertebral endplates" and "[m]ild degenerative changes at C4-C5" (AR 530), and a March 2009 MRI of his lumbar spine showed normal results other than an "[o]ld compression fracture of the superior endplate of L1"[3] (AR 532).  A January 2012 MRI of the lumbar spine again

---

[3]  Bernard argues that this MRI also revealed "'an associated Schmorl's node,'" but neglects to explain or reference evidence indicating what this is or how it limited his functionality.  (Doc. 12–1 at 10 (quoting AR 532).)

revealed only an old compression fracture, as well as mild facet joint changes, but no acute abnormality or disc pathology.  (AR 745–46.)  Considering these imaging studies, as well as evidence demonstrating that Bernard consistently exhibited "negative straight leg raise, normal motor functioning, and generally normal sensation aside from that related to [his] history of cubital tunnel [syndrome]," the ALJ reasonably stated that "[s]uch objective findings tend to support an ability to perform at least a range of light[-]exertion work despite [Bernard's] back and neck impairments."  (AR 15.)

### D.      Ability to Work Before Alleged Disability Onset Date

Lastly, Bernard finds fault with the ALJ's observation that Bernard continued to work for several years after his injuries and stopped working for reasons unrelated to his impairments.  Again, however, the record supports the ALJ's observation.  Specifically, the ALJ stated: "[T]he records indicate that [Bernard] suffered [from] . . . his alleged impairments well prior to the period at issue, and was able to work for several years thereafter without issue.  Further, it appears that he stopped working after he was fired for something unrelated to his impairments."  (AR 15.)  Bernard testified that he worked for six months as a fry cook at Kentucky Fried Chicken and Taco Bell after March 20, 2008, the alleged disability onset date.  (AR 41; *see also* AR 271, 294, 351.)  Moreover, the record reveals that, in the period prior to the alleged disability onset date of March 20, 2008 and after the 2003 or 2004 car accident which allegedly caused Bernard's impairments, Bernard worked in a few other jobs.  (*See* AR 41–44, 268–70, 294, 308, 320, 351–52, 396.)  Several treatment notes from July 2007 through December 2008 list Bernard's occupation as "mason" and state that he was working full time on specific dates during that period.

(AR 712–19.)  The ALJ's consideration of this work activity–particularly the work done during the alleged disability period–was proper, even if the work was done on only a part-time basis.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work [during the alleged disability period] cuts against his claim that he was totally disabled.").

It was also proper for the ALJ to consider the reasons Bernard stopped working in these various jobs.  Although Bernard testified at the November 2012 administrative hearing that he was "let go" of his fry cook job because he was not dependable and did not appear for work as required (AR 41), and that a December 2008 job (along with other jobs) "didn't work out" because he was unreliable due to arm pain (AR 48–49), a February 2008 medical report states that Bernard reported he was fired from a construction job in August 2007 because "a major contractor with his boss was intimidated by his appearance and did not want him there on the job site" (AR 463).  It is for the Commissioner, not the court, to resolve potential factual inconsistencies like this, in the context of assessing the claimant's credibility.  *See Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.") (alteration in original) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).  And the court "must show special deference" to credibility determinations made by the ALJ, "who had the opportunity to observe the witnesses'

demeanor" while testifying.  *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81

(2d Cir. 1994).  If the ALJ's credibility assessment is supported by substantial evidence, the

court must uphold it, even if substantial evidence supporting the claimant's position also

exists.  *Aponte*, 728 F.2d at 591; *see Alston*, 904 F.2d at 126 ("Where there is substantial

evidence to support either position, the determination is one to be made by the factfinder.");

*Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) ("[W]e will defer to [the agency's

credibility] determinations as long as they are supported by substantial evidence.").  Here,

substantial evidence supports the ALJ's assessment of Bernard's credibility, and thus the

Court finds no error.

## II.     The ALJ's analysis of the medical opinions was proper.

Bernard also contends the ALJ erred in her analysis of the medical opinions and

should have given more weight to the opinions of treating physician Dr. King and less

weight to those of agency consultants Drs. Ann Fingar and Christine Conley.  In response,

the Commissioner asserts that the ALJ's analysis of the medical opinions is legally proper

and supported by substantial evidence.  The Court again agrees with the Commissioner, and

finds no error in the ALJ's analysis of the medical opinions, as discussed below.

### A.     Treating Physician Dr. King

Bernard began treating regularly with Dr. King in July 2010.  (AR 544.)  Since then,

Dr. King has treated Bernard's various medical issues, including chronic back and neck pain

and left elbow pain and other symptoms.  (*See, e.g.*, AR 783–87, 799–800.)  In November

2012, Dr. King completed a Medical Source Statement (MSS) regarding Bernard's physical

impairments since approximately December 2002.  (AR 822–26.)  Dr. King opined that, on

average, Bernard is likely to be absent from work due to his impairments about three or four

days each month.  (AR 826.)  Dr. King made the following particular assessments of

Bernard's physical limitations and abilities: Bernard can walk only two blocks without pain,

sit for only 45–60 minutes at a time, and stand for only 20 minutes at a time (AR 823–24);

he can stand for a total of only two to three hours, sit for a total of only four to five hours,

and walk for a total of only four to five hours, in an eight-hour workday (AR 824); he needs

to walk around for approximately 15–30 minutes every 20 minutes of the workday (*id.*); he

needs to shift positions from sitting, standing, and walking at will, and take unscheduled

breaks lasting up to 45 minutes each every hour (*id.*); he can frequently lift less than 10

pounds and only occasionally lift 10 pounds (AR 825); due to reduced ability to flex his

neck, he can only occasionally look to the left, rarely look down and to the right, and never

look up (*id.*); he can rarely twist and never stoop, crouch/squat, and climb ladders (*id.*); he

has significant limitations with reaching, handling, and fingering with the left hand (*id.*); he

can never reach in any direction with his left arm (*id.*); and he has limited vision due to left

strabismus (crossed eyes) (AR 826).

Under the "treating physician rule," the opinions of a treating physician such as Dr.

King are afforded "controlling weight" when they are "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the

other substantial [record] evidence."  20 C.F.R. § 404.1527(c)(2).  Even when a treating

physician's opinions are not given controlling weight, the opinions are still entitled to some

weight, given that this physician is "likely to be the medical professional[] most able to

provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may

bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* The deference given to a treating physician's opinions may be reduced, however, upon consideration of several factors, including the length and nature of the treating physician's relationship with the claimant, whether the physician is a specialist, the extent to which the medical evidence supports the physician's opinions, the consistency of the opinions with the rest of the medical record, and any other factors which tend to contradict the opinions. *Id.* at (c)(2)–(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). When controlling weight is not afforded to a treating physician's opinions, the ALJ's decision must contain "specific reasons" for the weight given to the opinions, supported by the evidence in the case record; and the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating [physician's] medical opinion[s] and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998) (where an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so).

Here, the ALJ afforded "little weight" to Dr. King's opinions for the reason that they are "inconsistent with the evidence of record, which consistently indicates only mild lumbar and cervical findings as well as no atrophy of the upper extremities and normal gross and dexterous movements." (AR 16.) As discussed above, the ALJ also found that Dr. King's opinions are "inconsistent with [Bernard's] lack of current need for narcotic pain medication as well as his reported activities of daily living." (*Id.*) Substantial evidence supports these

17

findings.  For example, Dr. King opined that Bernard began having the significant physical

limitations detailed in the MSS on "12/4/2002," the date that Bernard was involved in an

automobile accident.[4]  (AR 823.)  But that is almost six years before Bernard's alleged

disability onset date of March 20, 2008; and Bernard worked in physically demanding jobs,

including as a painter and a mason, for several years after December 2002.  (*See* AR 41–44,

268–70, 294, 308, 320, 351–52, 396, 712–19.)  Moreover, Dr. King's assessment that

Bernard could not reach in any direction with his left arm (AR 825) is inconsistent with an

April 2008 x-ray of Bernard's left shoulder which revealed no abnormality (AR 527) and an

August 2012 treatment note which states that Bernard's left shoulder range of motion was

normal and symmetrical (AR 693).  Dr. King's assessment that Bernard had significant

limitations in reaching, handling, and fingering with the left hand (AR 825) is inconsistent

with the April 2008 statement of Dr. Whittum, who had performed carpal tunnel release

surgery on Bernard, that Bernard had "good resolution of carpal tunnel syndrome" with only

mild pain (AR 490).  Dr. King's assessment that Bernard could never bend or stoop

(AR 825) is inconsistent with an April 2008 x-ray of Bernard's sacrum and coccyx which

shows no evidence of abnormality and no significant degenerative change of the sacroiliac

joint (AR 529) and negative straight leg raise testing recorded in 2009, 2010, and 2012

(AR 542, 697, 701, 705, 709, 792).  Finally, Dr. King's assessment that Bernard had limited

---

[4]  It is not clear from the record when exactly Bernard's automobile accident occurred.  It appears, however, to have been either in 2003 or 2004, not in 2002 as Dr. King indicated in his MSS.  (*Compare* AR 396 (January 22, 2004 treatment note referencing motor vehicle accident), 397 (April 19, 2004 treatment note referencing "5/7/03" motor vehicle accident), 658 (2011 disability evaluation referencing 2004 car accident), and 823 (Dr. King's MSS referencing 12/4/02 motor vehicle accident).)

vision due to left strabismus (AR 826) is inconsistent with Bernard's own reporting to a medical provider in January 2013 that he had "no subjective vision difficulties" (AR 835).

Dr. King's opinions are also inconsistent with those of Dr. Roomet, a consultative examiner who opined in January 2013 that, despite Bernard's "multiple subjective complaints," "[o]bjective examination does not reveal any evidence for true complex regional pain syndrome although he does have some ulnar nerve pain and symptomatology without objective findings." (AR 836.) Dr. Roomet assessed Bernard as having various physical limitations, but noted that these limitations were "based on [Bernard's] history" and that "[t]rue objective findings are relatively sparse." (*Id.*) Despite assessing Bernard as having various physical limitations, including a significantly limited ability to sit and stand at one time in an eight-hour workday, Dr. Roomet opined that Bernard could perform a number of activities of daily living, including shopping, traveling alone, walking at a reasonable pace on uneven surfaces, using public transportation, preparing meals, and handling and sorting paper/files. (AR 832.) Finding that these opinions are "generally consistent with [Dr. Roomet's] exam of [Bernard]," the ALJ gave Dr. Roomet's opinions "some weight." (AR 16.) Bernard does not contest this assessment, and it is supported by substantial evidence.

###    B.    Agency Consultants Drs. Fingar and Conley

Dr. King's opinions are also inconsistent with the opinions of nonexamining agency consultants Drs. Fingar and Conley. Dr. Fingar opined in a July 2011 RFC assessment that Bernard could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours and sit for a total of about six hours

in an eight-hour workday; occasionally push and pull with the left upper extremity;

frequently climb ramps and stairs; frequently stoop; occasionally climb ladders, ropes, and

scaffolds; and occasionally reach with the left upper extremity to the front, laterally, and

overhead.  (AR 123–24.)  A few years earlier, Dr. Conley made essentially the same

opinions in a March 2008[5] RFC assessment of Bernard's physical limitations.

(AR 483–84.)

    The ALJ gave the opinions of Drs. Fingar and Conley "substantial weight," on the

grounds that they are "generally consistent with the totality of the medical evidence on

record . . . , which indicates good range of motion and strength in all extremities throughout

the overwhelming majority of the period."  (AR 15–16.)  The ALJ further explained that she

gave "more weight" to Dr. Fingar's opinions than to Dr. Conley's because Dr. Fingar "was

able to review much more of the evidence on record during the period at issue."  (AR 16.)

Moreover, the ALJ stated that, considering Bernard's "somewhat credible" hearing

testimony regarding right shoulder pain due to his neck impairment and difficulty reaching

bilaterally, the RFC "included a limitation for only occasional[] overhead reaching with the

right upper extremity," which is a greater limitation than included in the agency consultant

reports.  (*Id.*; *see* AR 124.)

    The Court finds no error in the ALJ's allocation of substantial weight to the opinions

of agency consultants Drs. Fingar and Conley, while affording little weight to the opinions

of treating physician Dr. King.  The regulations clearly permit the opinions of agency

---

    [5] The ALJ mistakenly states that Dr. Conley's assessment was prepared "in March of 2010" (AR 15) rather than in March of 2008, the date stated in the assessment (AR 489).  The error is harmless.

consultants to override those of treating physicians, when the former are more consistent with the record evidence than the latter.  *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 563, 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.").  Here, the opinions of the agency consultants are more consistent with the record than those of treating physician Dr. King.  Thus, the ALJ acted within her discretion in weighing the agency consultant opinions more heavily than those of Dr. King, and her decision to do so is supported by substantial evidence.

## Conclusion

For these reasons, the Court DENIES Bernard's motion (Doc. 12), GRANTS the Commissioner's motion (Doc. 13), and AFFIRMS the decision of the Commissioner.


Dated at Burlington, in the District of Vermont, this 19th day of August, 2015.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


21